UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PERFECT COMPANY,<br><br>                    Plaintiff,<br><br>        v.<br><br>ADAPTICS LIMITED,<br><br>                    Defendant. | CASE NO. C14-5976-RBL<br><br>SECOND *MARKMAN* CLAIMS CONSTRUCTION<br><br>DKT. #264 & 265 |

THIS MATTER is before the Court following a claims construction hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The parties seek construction of seven claims of United States Patent No. 9,772,217 (the '217 patent). The Court has reviewed all of the materials presented, and heard expert testimony and argument of counsel.

## I. LEGAL STANDARD

Claim construction is a matter of law for the court. *Markman v. Westview Instruments, Inc.* 517 U.S. 370 (1996). The claims of the patent establish and limit the patentee's right to exclude by "describing the outer boundaries of the invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 27 n. 4 (1997). In construing the language of a claim, the court primarily focuses on so-called "intrinsic evidence" which is comprised of the patent itself,

including the claims, the specification and, if in evidence, the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Specifically, the court first looks to the words of the claims themselves, both asserted and non-asserted, to define the scope of the patented invention. The ordinary and customary meaning of a term is defined by a person of ordinary skill in the art (PHOSITA) at the time of the invention. *Id*. The context in which a term is used can be "highly instructive" in resolving the meaning of the term. *Id*. at 1314. For example, if a claim has the term "steel baffle," it strongly implies that the term "baffle" does not inherently include objects made of steel. *Id*. Other claims in a patent may also provide valuable contextual cues for deciphering the meaning of a term. *Id*. If a limitation is present in a dependent claim, then there is a presumption that the limitation is not present in the parent claim. *Id*. at 1314-15.

The court then reviews the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication[.] Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term. *Id*.

The prosecution history of a patent is the last piece of intrinsic evidence that a court should consider when construing the claims of the patent. *Id*. at 1317. The prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Id*. A court, however, should be aware that the prosecution history represents the ongoing negotiation between the PTO and the applicant, rather than the final product. *Id*. As such, the prosecution history may lack the clarity of the specification and may not be as useful for claim construction purposes. *Id*. In certain instances, however, the

1    prosecution history may provide guidance of an applicant's intent to specifically limit the scope

2    of a given claim term. *Id.*

3        Extrinsic evidence is the last category of evidence a court may consider when

4    construing patent claims. *Id.* Such extrinsic evidence includes expert and inventor

5    testimony, dictionaries, and learned treatises. *Id.* On its own, extrinsic evidence is

6    unlikely to be reliable in guiding the court's claim construction. *Id.* at 1319. Instead,

7    extrinsic evidence should be considered in the context of the intrinsic evidence. *Id.* A

8    court may also use extrinsic evidence to determine how a person of ordinary skill in the

9    art would understand the claimed invention. *Id.* It is the Court's duty to resolve fundamental

10   disputes among the parties as to the scope of a claim term, but it is not the Court's duty to

11   construe every claim term, or to repeat or restate every claim term. *See U.S. Surgical Corp. v.*

12   *Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *02 Micro Int'l Ltd. v. Beyond Innovation*

13   *Tech Corp.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

> Ultimately, the interpretation to be given a term can only be determined and
> confirmed with a full understanding of what the inventors actually invented and
> intended to envelop with the claim. The construction that stays true to the claim
> language and most naturally aligns with the patent's description of the invention will
> be, in the end, the correct construction.

*See Phillips v. AWH Corp.,* 415 F. 3d 1303, 1312 (Fed. Cir. 2005).

## II. DISPUTED TERMS

Because this is the second *Markman* hearing in this case, some terms have already been

construed. Dkt. #190. However, the following terms are disputed, and the Court's constructions

follow.

## 1. "Computing Device"

The term "computing device" appears in claims 1, 5, 6, 9, and 13. The parties' competing constructions are summarized in Perfect's opening brief:

| Claim Language | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| **Computing Device** | "A smart device having an integrated electronic display in the same housing, such as iPhone or an Android Phone or an iPad or a Tablet, capable of receiving real time data and displaying real time progress of the measured amount of an ingredient on the electronic display"[5] | "a device that computes (i.e., a computer)" |

Dkt. #274, at 6.

For its construction, Perfect relies chiefly on the following statement from the '217 Patent: "the culinary ratio system 100 has a smart scale 102, a smart device 104 (computing device) and a communication 105 there between." According to Perfect, this shows both that a "computing device" is something different from a "smart scale," and that a "computing device" is synonymous with a "smart device." Perfect then points to the '217 Patent's examples of things that might constitute a "smart device," which include "a personal computer and mobile device such as a tablet computer or a mobile phone." Perfect notes that the drawings of a "smart device" in the '217 Patent show a tablet computer. In addition, Perfect contends that in the original nonprovisional (from which the '365 and '217 Patents derive), and in '365 and '217 Patents themselves, the location of the electronic display is described as being "with" a computing device.

Adaptics argues that the ordinary meaning of "computing device" is the appropriate construction because the term merely consists of the word "device" modified by the word "computing." In addition, Adaptics argues "computing device" should be construed the same way in both Patents, and the parties used the term in a generic sense previously for the '365

1  Patent. Adaptics also contends that, because "examples of a smart device include a personal

2  computer and mobile device such as a tablet computer or mobile phone," there cannot be a

3  requirement that the electronic display be located in the same housing. Adaptics goes on to argue

4  that the Court should not adopt Perfect's construction because it would create redundancy with

5  other claim terms, such as "electronic display." Adaptics similarly contends that, if "computing

6  device" and "smart device" were actually identical terms, it would make no sense for the patents

7  to differentiate between them. Finally, Adaptics argues that "claim differentiation strongly

8  implies that not all 'computing devices' come 'with an electronic display,' much less an

9  'integrated electronic display.'" Dkt. #265, at 10 (differentiating claims 1 and 13).

10  The Court agrees with Perfect that Adaptics' ordinary meaning construction overlooks

11  the specification's context. *See Phillips*, 415 F.3d at 1321 ("[H]eavy reliance on the dictionary

12  divorced from the intrinsic evidence risks transforming the meaning of the claim term to the

13  artisan into the meaning of the term in the abstract, out of its particular context, which is the

14  specification."). The '217 Patent equates "computing device" with "smart device" by putting the

15  former in parentheses after the latter, showing that the words are intended to be used

16  interchangeably. This conclusion is reinforced by the specification's statement that, "[w]hen

17  appropriate, like reference materials and characters are used to designate identical,

18  corresponding, or similar components in different figures." This suggests that the author intended

19  to indicate such identicalness or similarity by subsequently inserting "computing device" in

20  parentheses next to "smart device."

21  Although Adaptics argues that this parenthetical could also be a way of indicating that a

22  "smart device" is a specific example of a type of "computing device," this theory would make

23  more sense if the article "a" were included in front of "computing device." It also overlooks the

24

fact that "computing device" was not included in parentheses after the term "smart scale," which is used earlier in the same sentence. If the term "computing device" were intended to bear a broad definition, that definition would presumably also encompasses a "smart scale," but the specification specifically omits an association between those two terms.

Furthermore, the specification and claims uniformly make clear that the "computing device" must be able to do three things: (1) receive real-time data from a scale, (2) perform various types of computations based on the data received, and (2) cause an electronic display to display real-time data. The term "computing device" first appears in the abstract, where it is described as "configured to communicate with the scale." The term is used only once in the specification, as described already. Then, the term is used numerous times throughout claims 1 through 16. In all of these claims, the "computing device" is described as "receiving real-time data from a scale" and "causing an electronic display to display real-time progress," or as "configured for" these functions. These capabilities are therefore essential qualities of the "computing device" envisioned by the '217 Patent, and Perfect's construction is correct to encompass them.

However, while the Court agrees that "computing device" should not simply take on its ordinary dictionary meaning, Perfect's hyper-specific construction contradicts the '217 Patent in several regards. First, if a "computing device" is the same as a "smart device," then the definition of "computing device" must necessarily include a "personal computer," which is the first example of a "smart device" listed in the specification. The specification also mentions elsewhere that a user can enter commands for the app through the "smart device" using a "mouse, a keyboard, or touch screen." Because a personal computer can have a separate monitor

and involves a mouse, Perfect's requirement that a "computing device" have an "integrated electronic display in the same housing" is incorrect.

Second, while all the claims reference the "computing device . . . *causing* the electronic display to display real-time progress," only claims 9 and 13 state that it is a "computing device *with* an electronic display." (emphasis added) While the word "with" implies the type of physical integration between the "computing device" and "electronic display" that Perfect advocates for, the omission of the word "with" from several claims implies that such integration is not necessary. *See Phillips*, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms."). The computing device could still cause the electronic display to display data remotely or through a wired connection without integration in the same housing. Consequently, Perfect's construction is too narrow.

Perfect's argument based on the drawings in the '217 Patent is also unpersuasive. The first sentence in the "Brief Description of the Drawings" section states, "The present invention will be described by way of exemplary embodiments, but not limitations, illustrated in the accompanying drawings." It later explains that the drawings "illustrate one or more embodiments of the invention," suggesting there could be more. *See Cont'l Circuits LLC v. Intel Corp.*, No. 2018-1076, 2019 WL 489069, at *6 (Fed. Cir. Feb. 8, 2019) (stating that the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment"). This makes clear that the Court's interpretation of claim terms should not be limited by the drawings.

Because neither party's construction is entirely satisfactory, the Court will adopt Perfect's construction but excise the phrase ". . . having an integrated electronic display in the same housing, such as iPhone or an Android Phone or an iPad or a Tablet . . . ." Dkt. #264, at 12. The

Court will also add the examples of a "smart device" listed in the specification and alter the end of Perfect's construction to conform to the actual language in the claims. "Computing device" therefore means "a smart device, including a personal computer and mobile device such as a tablet computer or a mobile phone, capable of receiving real time data and causing real time progress of the measured amount of an ingredient to be displayed on an electronic display."

## 2. "Electronic Display"

The term "electronic display" appears in claims 1, 5, 6, 9, 13, 17, and 21. The parties' competing constructions are summarized in Perfect's opening brief:

| Claim Language | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| **Electronic display** | "a computer screen or other electronic device capable of displaying text and graphics." | "a computer screen or other electronic device capable of displaying text or graphics" |

Dkt. #264, at 15.

The parties' dispute over the construction of "electronic display" comes down to two words: "and" vs. "or." Perfect argues that an "electronic display" must be able to represent "text *and* graphics" because the specification consistently depicts and describes this capability. Perfects also contends that an "electronic display" that only depicted text would be antithetical to displaying recipe blocks filling in proportion to the ingredient being added, which is Perfect's central inventive concept. In addition, Perfect points to the statement in the specification that "the culinary ratio system 100 has one or more graphical displays to show the real-time amount for any ingredient being added . . . ." This indicates that at least one display must be capable of depicting graphics, which precludes Adaptics' construction because it contemplates a scenario in which only text could be displayed.

In defense of its "text *or* graphics" construction, Adaptics argues that Perfect's construction is foreclosed by the specification, which describes a drawing of a "scale display" as displaying "real-time progress" that can be "graphical and/or numeric." This argument, however, relies on the "electronic display" being the same thing as the "scale display" in some embodiments. Adaptics contends that this interpretation is correct for several reasons, while Perfect argues that the "electronic display" has to be part of the "computing device." This disagreement about the possible locations of the "electronic display" is the main point of tension between the parties.

Adaptics is correct that there is no consistent limitation in the specification or claims that an "electronic display" be a part of the "computing device." To the contrary, there are several indications that the "electronic display" can be located on the "scale" in some embodiments. Under the description of a "Two-Way Communications Connection," the specification plainly states that "the scale display can be synchronized and controlled by the app" to show, among other things, "[r]eal-time progress of measurement." "Electronic display" is never described in the specification. However, the claims uniformly characterize "electronic display" as something the "computing device" causes to display "real-time progress of the measured amount of the active ingredient." In addition, as mentioned in the previous section, just claims 9 through 15 describe a "computing device *with* an electronic display." (emphasis added) Claims 1 through 8, in contrast, only describe a "computing device *causing* an electronic display to display real-time progress." (emphasis added) The embodiments contemplated by claims 1 through 9 therefore could correspond to the two-way communication connection described in the specification, meaning an "electronic display" can be located on the scale in some embodiments.

1  Because an "electronic display" can be located on the "scale," Perfect's construction

2  cannot be correct. The description for Figure 4 states that the "scale display" can display the

3  "[r]eal-time progress of measurement (graphical and/*or* numeric)." (emphasis added) Because at

4  least some embodiments involve a "scale display" that only depicts progress using numbers, and

5  in some embodiments an "electronic display" can be the "scale display," it follows that in some

6  embodiments an "electronic display" need not be capable of depicting graphics.

7      This construction does not conflict with the specification's requirement that the "culinary

8  ratio system" have "one or more graphical displays." While this indicates that every embodiment

9  must have a graphical display *somewhere*, the specification contemplates that in some

10  embodiments both the scale and smart device displays "may be used for displaying information

11  about recipe ingredients." Thus, while the "scale display" may depict that information in a solely

12  numerical form, the "smart device" could simultaneously depict the same information in a

13  graphical form. The fact that the claims do not appear to explicitly describe this dual-display

14  configuration does not mean that a second display could not exist, nor does it mean that the

15  "electronic display" that the claims do describe must be the one that depicts graphics. This

16  conclusion is reinforced by the claims' consistent use of the article "an" before "electronic

17  display," implying that there may be multiple. Thus, while it is true that the Perfect's invention

18  must involve at least one display capable of depicting graphics, not every "electronic display"

19  must have that capability.

20      The Court adopts Adaptics' construction. If Perfect had intended for "electronic display"

21  to uniformly mean "graphical display" or "smart device display," it would have been easy to use

22  such terms in the claims or define such an equivalence in the specification. Instead, Perfect chose

23  to trade the more specific terminology from the specification for much broader language in the

24

1  claims themselves. "Electronic display" accordingly means "a computer screen or other

2  electronic device capable of displaying text or graphics."[1]

3  **3.    "Scale"**

4        The term "scale" appears in claims 1, 5, 6, 9, 13, 17, and 21. The parties' competing

5  constructions are summarized in Perfect's opening brief:

| Claim Language | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| Scale | "A cabled or wireless smart kitchen scale configured to be in communication with a smart device to provide real-time data." | Adaptics asserts that this term can be given its plain and ordinary meaning. |

Dkt #264, at 16.

10        Perfect argues that its more restricted construction of "scale" is correct for several

11  reasons. First, Perfect points to the background section of the '217 Patent, which contrasts

12  Perfect's scale with "the standard kitchen scale" and "the common digital kitchen scale." Perfect

13  also argues that the only "scale" described as part of an inventive embodiment in the '217 Patent

14  is described as a "smart scale" and always shown as a digital kitchen scale. Perfect goes on to

15  assert that Adaptics' construction is overly broad and would produce absurd results, such as

16  including bathroom scales or trucking scales.

17        In response, Adaptics argues that Perfect's requirement that the "scale" be "configured to

18  be in communication with a smart device to provide real-time data" unnecessarily repeats

19  limitations that are already present in the claims. As for Perfect's use of the word "kitchen,"

20  Adaptics contends that this narrowing descriptor is not included anywhere in the claims and only

21

22

23  [1] The Court notes, however, that the construction presumes that an "electronic display" capable of displaying graphics can also display text and numbers. Otherwise, the "graphical *and*/or numeric" requirement from the description of the "scale display" would not be satisfied. (emphasis added)

24

1  appears twice in the background section of the specification. Adaptics observes that the '217

2  Patent does not limit the type of "scale" to "kitchen scale" anywhere.

3      The Court agrees with Adaptics that neither the specification nor the claims limit the

4  construction of "scale" to a "kitchen scale," or even directly describe it in such terms. Instead,

5  the background section merely refers to kitchen scales as a means of emphasizing what Perfect's

6  invention is improving upon. In addition, although the drawings depict kitchen scales, this alone

7  is not enough to mandate that all embodiments make use of kitchen scales. *See Intel Corp.*, 2019

8  WL 489069, at *6. Perfect's construction is therefore incorrect insofar as it refers to a "*kitchen*

9  scale." (emphasis added)

10      However, the rest of Perfect's construction is preferable to Adaptics'. The "scale"

11  described in the specification is uniformly referred to as a "smart scale." The specification states,

12  "As shown in the embodiments in FIGS. 1-6, the culinary ratio system has a smart scale, a smart

13  device (computing device) and a communication connection." Importantly, this statement is not

14  describing the embodiments but using the embodiments to describe the system itself, which

15  necessarily involves a smart scale. *See Trustees of Columbia Univ. in City of New York v.*

16  *Symantec Corp.*, 811 F.3d 1359, 1365 (Fed. Cir. 2016) (distinguishing between a specification's

17  description of preferred embodiment and statements that describe the overall scope of a term).

18      The "scale" described in every claim also has the ability to transmit "real-time data" to a

19  "computing device" as a uniform feature. This makes the second part of Perfect's construction an

20  accurate description of the scope of the term "scale" as it is used in the claims. While language

21  similar to Perfect's construction is also included in the claims themselves, this does not create the

22  kind of redundancy where some claims become purposeless because their defining limitations

23  have been incorporated into a term's construction. *See, e.g., Mynette Techs., Inc. v. United*

24

*States*, 139 Fed. Cl. 336, 354 (2018) ("responsive" and "readable" had to have different meanings to avoid redundancy). Here, the inventor intended to exclude any scale incapable of communicating real-time data to another device from the scope of the invention. Consequently, "scale" means "a cabled or wireless smart scale capable of communicating with a smart device to provide real-time data."

**4.     "Real-Time Progress"**

The term "real-time progress" appears in claims 1, 5, 6, 9, 13, 17, and 21. The term "real-time" was already interpreted in the prior *Markman* hearing, so this dispute mainly focuses on the word "progress." *See* Dkt. #190. The parties' competing constructions are summarized in Perfect's opening brief:

| Claim Language | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| **Real-Time Progress** | Plaintiff submits that with the previously determined construction of "real time" no further construction is needed. | "a graphical or numeric indication of measured weight, especially in comparison to target weight, presented in real-time" |

Dkt. #264, at 11.

More specifically, Perfect advocates for attaching the Merriam-Webster Dictionary definition of "progress" to the Court's previous construction of "real-time," yielding: "Relating to a system in which input data is processed within milliseconds so that it is available virtually immediately as feedback, the feedback showing movement toward a goal or to a further or higher stage." Perfect argues that the specification does not suggest limiting the construction to an indication of "measured weight." Perfect also contends that the phrase following "especially" is not limiting and therefore should not be included.

Adaptics' construction is basically an attempt to import aspects of their construction of "electronic display" into this term. According to Adaptics, its construction is necessary because

the specification states that "real-time progress of measurement" may be "graphical and/or numeric." However, as Perfect points out, its construction does not rule this out. Indeed, its construction of "electronic display" also does not rule this out, since Perfect only contends that the display must be *capable* of displaying graphical content, not that it always does.

The parties' disagreement over this term appears to serve no purpose. While "real-time progress" is consistently used in the claims to refer to "real-time progress of the measured amount of the active ingredient," Adaptics' construction does not capture the meaning of the word "progress," which refers to something that is ongoing. In this regard, Perfect's construction is more accurate. "Real-time progress" therefore means "Relating to a system in which input data is processed within milliseconds so that it is available virtually immediately as feedback, the feedback showing movement toward a goal or to a further or higher stage."

## 6. "Tared Weight"

The term "tared weight" appears in claims 1, 5, 6, 9, 13, 17, and 21. The parties' competing constructions are summarized in Perfect's opening brief:

| Claim Language | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| Tared weight | "Tared weight represents weight added to the scale since taring, determined by taking a current weight (a weight currently measured by a scale) and subtracting an adjustment amount (typically a weight previously measured by the scale)." | "the net weight on a scale after a tare is taken, representing the weight added to the scale since taring" |

Dkt. #264, at 18.

The parties are basically in agreement that these two definitions are functionally equivalent and simply argue over whether specificity or conciseness should be emphasized. Because the specificity of Perfect's construction makes it easier to apply, the Court adopts it.

### 7. "Taring"

The term "taring" appears in claims 1, 5, 6, 9, 13, 17, and 21. The parties' competing constructions are summarized in Perfect's opening brief:

| Claim Language | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| Taring | "Changing the adjustment amount in the calculation of the tared weight to the current weight measured by the scale." | "to adjust the measured or displayed weight on a scale so that it reads zero." |

Dkt. #264, at 21.

The parties' disagreement for "taring" is essentially the same as for "tared weight." The Court therefore adopts Perfect's construction for the same reason.

### 8. "Culinary Combination"

The term "culinary combination" appears in claims 1, 5, 6, 9, 13, 17, and 21. The parties' competing constructions are summarized in Perfect's opening brief:

| Claim Language | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| Culinary combination | "1. Food produced for human consumption by a process by combining, mixing and heating ingredients.<br>2. A drink for human consumption (e.g., cocktail) produced by mixing ingredients, often involving alcohol." | Adaptics asserts that this term can be given its plain and ordinary meaning. |

Dkt. #264, at 19.

Perfect argues that this term must be construed because the parties may disagree about its plain and ordinary meaning. Adaptics contends that construction is unnecessary because "culinary combination" appears in the preamble to the claims, which states, "A method for a computing device to assist a user in assembling a culinary combination according to a recipe, the recipe identifying one or more ingredients and one or more target amounts, each of the ingredients associated with one of the target amounts, the method comprising . . . ." Adaptics

asserts that this use of "culinary combination" does not limit how Perfect's inventive "method" operates and thus needs no construction. If the term is construed, Adaptics objects to Perfect's construction to the extent that it is limited to "human consumption."

"Generally, the preamble does not limit the claims." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). However, the preamble may be limiting "when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention," i.e., the preamble is "necessary to give life, meaning and vitality to the claim." *Id*. (internal quotations omitted). "On the other hand, a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (internal quotations omitted). Courts make this determination "on the facts of each case in view of the claimed invention as a whole." *Allen Eng'g*, 299 F.3d at 1346.

In *Poly-America*, the court held that the term "blown-film" was limiting as used in the preamble, which started every claim with, "A blown-film textured liner, comprising . . . ." 383 F.3d at 1310 (quoting US PAT 5763047). The court explained that the term represented an "important characteristic of the claimed invention" and also pointed out that the term appeared in the title, summary, embodiment descriptions, and all the claims. *Id*. Similarly, in *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, the court held that a phrase in the preamble was limiting because it was "intimately meshed with the ensuing language in the claim." 182 F.3d 1298, 1306 (Fed. Cir. 1999). The court reached this conclusion because the last clause in the claim, which described the type of shape the patented printer should generate, harkened back to the same terms that appeared in the preamble. *Id*.

In contrast, in *Allen Engineering*, the court held that the term "fast steering" was not limiting as used in the preamble. 299 F.3d at 1347. The preamble described the invention as "[a] self-propelled, fast steering motorized riding trowel for finishing a concrete surface, said trowel comprising ...." *Id*. at 1346. The court held that the term merely described the invention's purpose, and noted that the specification and claims provided no interpretive frame of reference for the term. *Id*.

Here, while "culinary combination" is used to identify the invention's purpose and does not itself show up in the body of the claims, it also defines the scope of a term that shows up repeatedly in the claims: "ingredient." Indeed, unlike *Allen Engineering*, the specification provides an interpretive frame for "culinary combination" by stating, "As used herein, culinary combinations will include creations of mixology and of cooking." "Culinary combination" thus limits the types of "ingredients" that the claims refer to, making "culinary combination" a limiting term.

This leaves only the question of whether Perfect's construction properly limits the term to "human consumption." While the embodiments depict food or drinks for human consumption, the '217 patent only explicitly limits "culinary combination" by stating that it *includes* "creations of mixology and of cooking." Thus, even if those terms related solely to human consumption, the specification does not create an exclusive list. The *Merriam-Webster Dictionary* defines "culinary" as, "of or relating to the kitchen or cookery," which also does not limit the definition to human consumption. Consequently, the word "human" will be excised but Perfect's construction is otherwise adopted. Accordingly, "culinary combination" means "food produced for consumption by a process by combining, mixing, and heating ingredients, or a drink for consumption (e.g., cocktail) produced by mixing ingredients, often involving alcohol."

**9.    "Out of the Order"**

The term "out of the order" appears in claims 5, 13, and 21. The parties' competing constructions are summarized in Perfect's opening brief:

| Claim Language | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| Out of the order | "Not in the order of actions and/or ingredients recommended by a recipe to make a culinary combination." | "wherein the one or more recipe ingredients are in an arranged sequence; and wherein the second ingredient is selected from the arranged sequence of one or more ingredients" |

Dkt. #264, at 19.

Perfect argues that its construction correctly corresponds to the specification, which states that "[t]he culinary ratio system 100 displays ingredients and actions of a recipe in a logical and intuitive order" and references a "recommended order of actions and ingredients." The specification later explains that Figure 18 shows how "[t]he culinary ratio system 100 keeps an ingredient history of ingredient events," including "any measured ingredient activity occurring out-of-order." According to Perfect, "the order" mentioned in the claims is actually "the recommended order" described in the specification.

Adaptics argues that "out of the order" must be read within the context of the preceding clauses in claims 5, 13, and 21. Those clauses read:

"the computing device de-selecting the first ingredient as the active ingredient and <u>selecting a second ingredient from the one or more ingredients</u> as the active ingredient in response to receiving a command from the user;

<u>wherein the one or more recipe ingredients are in</u> <u>an order;</u>

and wherein <u>the second ingredient is selected</u> <u>out of the order.</u>"

Adaptics argues that "the" is used to refer to the antecedent "an order." Adaptics also equates "out of" with "from," and argues that there is no support for equating "out of the order" with "out of order," as Perfect advocates.

The most important sticking point between the parties is the appropriate definition of "out of." The *Merriam-Webster Dictionary* defines "out of" as, "used as a function word to indicate choice or selection from a group," which would favor Adaptics' construction. However, it also defines it as, "used as a function word to indicate a position or state away from the usual or expected," which would favor Perfect's definition. Whether or not "the order" referenced in the claims is actually "the *recommended* order," an "order" always refers to some kind of prescribed sequence. Therefore, selecting an ingredient "away from" the order identified in the claims, even if it is not necessarily the "recommended order" mentioned in the specification, would still comport with Perfect's construction.

However, Perfect's construction is ultimately superior to Adaptics because it aligns with the specification's description of how the system deals with "mistakes" that result from a user adding an ingredient at the wrong time. Consequently, the Court adopts Perfect's construction.

**10.  "Target Amount"**

The term "target amount" appears in claims 1, 5, 6, 9, 13, 17, and 21. The parties' competing constructions are summarized in Perfect's opening brief:

| Claim Language | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| **Target amount** | "the amount of ingredient designated to be added, converted if necessary to the same unit measured by the scale prior to comparison with the weight measured by the scale." | Adaptics asserts that this term can be given its plain and ordinary meaning. |

Dkt. #264, at 20.

Although Adaptics contends that "target amount" should be given its plain and ordinary meaning, Adaptics also does not object to Perfect's construction. *See* Dkt. #265, at 20. In light of this, the Court adopts Perfect's construction.

**11.  "Upper Threshold"**

The term "upper threshold" appears in claims 1, 9, and 17. The parties' competing constructions are summarized in Perfect's opening brief:

| Claim Language | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| **Upper threshold** | "A designated maximum value of the measured weight of an ingredient to be added that is greater than the target amount." | Adaptics asserts that this term can be given its plain and ordinary meaning. |

Dkt. #264, at 21.

Adaptics has indicated that it has no objection to Perfect's construction, and the Court therefore adopts it. *See* Dkt. #264, at 21.

**12.  "Real Time"**

Although "real time" was already construed during the prior *Markman* hearing [Dkt. #190], Adaptics urges the Court to adopt its new construction, which it summarizes in its opening brief:

| Adaptics' Proposed Construction | Current Construction |
|---|---|
| "Pertaining to a system or mode of operation in which computation is performed during the actual time that an external process occurs, in order that the computation results can be used to control, monitor, or respond in a timely manner to the external process" | "Relating to a system in which input data is processed within milliseconds so that it is available virtually immediately as feedback" |

Dkt. #265, at 15.

Perfect argues that the Court should reject Adaptics' new constructions of terms that were already construed in the previous *Markman* hearing. Perfect points to Adaptics' own Motion to Consolidate the '365 and '217 patent cases, in which Adaptics argued that the two patents were nearly identical. *See* Dkt. #213, at 2, 5. Adaptics assured the Court that Perfect would have the ability to present additional terms for construction but did not suggest that it would re-visit previously construed terms. *Id*. at 5. Perfect also identifies several cases holding that identical terms in related patents should be construed consistently unless the Court is "otherwise compelled." *See Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003); *see also Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016).

Adaptics admits that its new construction is "very similar" to the current construction but argues that its definition of "real time" is superior because it derives from a technical dictionary. Dkt. #265, at 23-24. However, Adaptics' expert "agrees with the Court's current construction generally." *Id*.

The parties and the Court have already invested significant resources in construing the term "real time." Indeed, it was a primary focus of the first *Markman* hearing. The fact that Adaptics moved to consolidate the '365 and '275 patent cases does not give it license to re-litigate issues that have already been decided, especially where there is no substantial reason to change course. As Perfect points out, Adaptics does not provide a sound reason for why it could not have presented this construction at the prior *Markman* hearing. The IEEE Dictionary of Standards and Terms that Adaptics relies on for its new construction is not new and certainly does not post-date the last hearing. The Court will therefore not alter the current construction of "real time."

### 13. "Period of Inactivity"

"Period of inactivity" was also previously construed when the parties submitted their Joint Claim Construction Chart, in which Adaptics waived objection to Perfect's construction. Dkt. #141. However, Adaptics argues for the following new construction, summarized in its opening brief:

| Adaptics' Proposed Construction | Perfect's Proposed Construction |
|---|---|
| "A measure of time in which the measured weight on the scale does not change significantly" | "A predetermined measure of time for the system to determine the use has stopped adding an ingredient or stopped taking an action" |

Dkt. #265, at 22.

Adaptics argues that its new construction is necessary because Perfect's previous construction introduces an improper intent requirement by using the word "predetermined." Adaptics also contends that Perfect's construction improperly focuses on the goal of data monitoring instead of the data monitoring itself. Perfect responds that its construction is superior because it accounts for the specification's statement that "the user can adjust the period of inactivity." By ignoring this important description of the term in the specification, Perfect contends that Adaptics' construction falls short. Finally, Perfect points out that Adaptics' use of the word "significantly" introduces uncertainty.

For the same reasons described with respect to "real time," the Court will not adopt Adaptics' new construction of "period of inactivity." However, in addition, Perfect's existing construction more accurately accounts for the term's meaning as used in the specification. While it is true that Perfect's construction focuses on the data monitoring's goal, "period of inactivity"

is referenced in the specification within a goal-oriented context. Specifically, the "period of inactivity" tells the "scale" when to "perform[] a 'tare' and advance to the next recipe block."

The word "predetermined" also does not introduce the "intent" element that Adaptics insists on. Instead, it addresses the fact that the specification contemplates a *specific* "period of inactivity" that must be set either by the product itself or adjusted by the user manually. Adaptics' construction does not address this context from the specification. The Court will therefore not alter the current construction of "period of inactivity."

## CONCLUSION

Therefore, the Court construes the disputed terms in the '217 patent as set forth above.

IT IS SO ORDERED.


Dated this 20th day of February, 2019.


Ronald B. Leighton
United States District Judge