UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PERFECT COMPANY,<br><br>                Plaintiff,<br><br>    v.<br><br>ADAPTICS LIMITED,<br><br>                Defendant. | CASE NO. 3:14-cv-05976-RBL<br><br>ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>DKT. ## 317 & 321 |

## INTRODUCTION

THIS MATTER is before the Court on Defendant Adaptics Limited's Motion for Partial Summary Judgment. Dkt. ## 317, 321. The underlying patent dispute in this case concerns two products that enable a user to make food and mix drinks using weight-based measurements. Both products achieve this via an electronic scale that communicates with an app.

Perfect Company initially sued Adaptics on December 12, 2014, alleging that Adaptics' Drop Kitchen Connected Scale and Drop Kitchen Recipe App infringed its Patent No. 8,829,365. Three months later, Perfect joined Apple as a co-defendant. Perfect alleged that Apple infringed its patent by selling Adaptics' iOS-configured products via the App Store and at its brick-and-mortar locations. Perfect also alleged that Apple induced its customers to infringe Perfect's

patent by selling Adaptics' products. Perfect later sued under its patent no. 9,772,217, which claims priority to the '365 patent, resulting in the two cases being consolidated. Dkt. #232.

On September 25, 2015, Perfect settled with Apple and agreed not sue Apple or any of its customers, affiliate, suppliers, and others for infringement of the '365 patent or others claiming priority to it. *See* Dkt. #322, at §§ 1.1-1.2, 2.1-2.2. The settlement covers all products sold by Apple, past and future. *Id*. at §§ 1.1, 2.1-2.2. However, the settlement contains a "carve out" that specifically excludes infringement claims against Adaptics and any other entity that designs or manufactures products or services that infringe Perfect's patents. *Id*. at § 2.7. The covenant not to sue references the carve out section, thus excluding Adaptics from the broad covenant and release of Apple's affiliates and suppliers. *Id*. at § 2.1.

Adaptics argues that this settlement functions as an authorization for Apple to sell any and all Adaptics products utilizing the iOS system. Applying the doctrine of patent exhaustion, Adaptics contends that Perfect extinguished its right to sue Adaptics or any other party for infringement with respect to the products it authorized Apple to sell. Under Adaptics' conception of patent exhaustion, as soon as a patentee authorizes the sale of a particular type of product, that product passes outside the patent monopoly and cannot be the object of a lawsuit. Adaptics argues that, if Perfect's patent rights were not exhausted by the Apple authorization, Perfect would be able to collect twice on the value of its patent.

Perfect vigorously resists this characterization of patent exhaustion. According to Perfect, patent exhaustion only applies to subsequent, downstream purchasers after an initial authorized sale. Consequently, because Apple is not the initial manufacturer and seller, the settlement did not trigger patent exhaustion. Perfect also argues that "[t]he Settlement Agreement agreed to dismiss Apple as a defendant, but did not actually immunize Apples [sic] activities to the extent

they relate to Adaptics' infringing conduct." Dkt. #331, at 10. Perfect goes on to assert that the Supreme Court has held that settling with one defendant does not immunize another and that such a settlement does not provide a double recovery. Finally, as a side note, Perfect also points out that Adaptics failed to plead patent exhaustion as an affirmative defense.

**DICUSSION**

**1.     Legal Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must *view all evidence in the light most favorable to the nonmoving party* and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986) (emphasis added); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**2.     Patent Exhaustion**

The parties focus much of their attention on the extent to which the settlement authorizes Apple to sell the same products that Perfect is also suing Adaptics over. However, the success or failure of Adaptics' Motion hinges on one legal issue: whether an authorized sale of a product exhausts all patent rights in that type of product against both downstream and upstream parties in the chain of commerce. Adaptics largely takes for granted that it does, but the case law suggests otherwise.

The Supreme Court recently provided a refresher on the patent exhaustion doctrine in *Impression Products, Inc. v. Lexmark International, Inc.*, 137 S. Ct. 1523, 1532-33 (2017). The Court began with a brief history lesson characterizing the doctrine as "the point where patent rights yield to the common law principle against restraints on alienation." 137 S. Ct. at 1531. "Because 'the purpose of the patent law is fulfilled ... when the patentee has received his reward for the use of his invention,' that law furnishes 'no basis for restraining the use and enjoyment of the thing sold.'" *Id*. at 1532 (quoting *United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942)). Consequently, "[t]he patent laws do not include the right to 'restrain [ ] ... further alienation' after an initial sale." *Id*. (quoting *Straus v. Victor Talking Machine Co.*, 243 U.S. 490, 501, 37 S.Ct. 412, 61 L.Ed. 866 (1917)).

The Court then discussed several cases in which patentees granted licenses to retailers to sell their products under limited terms. *Id.* at 1533 (discussing *Bos. Store of Chicago v. Am. Graphophone Co.*, 246 U.S. 8, 17-18 (1918) (retailer had to sell at specific price); *United States v. Univis Lens Co.*, 316 U.S. 241, 248 (1942) (same); *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 638 (2008) (buyer had to use processors with parts manufactured by the patentee)). Although these patentees could limit the scope of their authorizations, they could not restrict the use of their products after they had moved "outside the scope of the patent monopoly." *Id*. In keeping with that principle, the Court held that the patentee in the case at hand could not use patent law to enforce its "single use/no-resale provision" after it had sold its product to the defendant. *Id*.

Although it is a common scenario, patent exhaustion does not only apply when a patentee sells their own product. In *TransCore, LP v. Electronic Transaction Consultants Corp.*, for example, a patentee settled a dispute with an alleged infringer, then years later tried to sue a consulting company that agreed to set up and test a product purchased from the previous infringer. 563 F.3d 1271, 1273-74 (Fed. Cir. 2009). The court held that the settlement, in which the patentee agreed not to sue for infringement, acted as an authorization to sell the product. *Id*. at 1276. This is because "a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee." *Id*. at 1275. Consequently, the patentee's rights against the consulting company as a subsequent purchaser were exhausted. *Id*. at 1277.

Here, Adaptics is likely correct that Perfect's settlement with Apple functions as an authorization for Apple and its customers to sell Adaptics' iOS products as they wish. The settlement with Apple is largely indistinguishable from the settlement in *TransCore* insofar as both include a covenant that the patentee will not sue the defendant for infringement of specific

patents.[1] *See id.* at 1277; Dkt. #322, at § 2.1. While the carve out specifically preserves Perfect's right to sue Adaptics, the other sections of the settlement do not restrict Apple's ability to purchase or sell products. *Id*. at § 2.7. Consequently, insofar as the carve out limits the covenant not to sue, it does so only by excluding Adaptics from the list of parties that are released from potential liability. *Id*. at §§ 1.3, 2.1-2.2.

However, because patent exhaustion only applies to the patentee's rights against downstream transfers, Perfect's settlement with Apple did not exhaust its rights against Adaptics. Any argument to the contrary would require a novel, upstream-oriented application of patent exhaustion that has no support in case law. Although Adaptics argues that *Impression Products* "expanded" the exhaustion doctrine by holding that "a patent owner can collect once and only once per product under patent law," this is inaccurate. Dkt. #321, at 1, 6. According to the Court's description of patent exhaustion, "when a patentee sells one of its products . . . [t]he purchaser and all *subsequent* owners are free to use or resell the product." *Id*. at 1529 (emphasis added). The Court then applied this principle in a straightforward manner by holding that the patentee's own initial sale moved its product "outside the patent monopoly." *Id*. at 1533. This description and application of patent exhaustion is limited to transactions downstream of the authorized sale and says nothing about whether a patentee's rights against upstream parties are exhausted.[2] Here, Adaptics is not a subsequent purchaser, but rather the original designer, manufacturer, and supplier of its products to Apple, making exhaustion inapplicable.

---

[1] Actually, the settlement in *TransCore* was less clearly an authorization to sell because it only stated that the patentee would not sue "for future infringement" without specifying which actions the defendant could take. 563 F.3d at 1276. The court nonetheless held that the lack of limitations in the settlement meant that "all acts" were authorized. *Id*. Here, however, the settlement's description of the covered products specifies that the settlement covers any products "designed, branded, made, used, sold, offered for sale, leased, purchased, licensed, imported, exported, supplied, or otherwise provided by or for Apple or an Apple Affiliate." Dkt. #322, at § 1.1.

[2] Indeed, the Court's summary of the issues also did not present Adaptics' claimed "expansion" of patent exhaustion as a question that was before the Court. *See Impression Products*, 137 S. Ct. at 1529 ("This case presents two

Adaptics points to the Court's explanation that an authorized sale by any third party is tantamount to the patentee making the sale themselves, resulting in the sale "exhaust[ing] the patentee's rights in *that item*." *Id*. at 1535 (emphasis added). But the Court's use of the term "that item" was not, as Adaptics wishes, a reference to that type of product universally, or even that particular item with respect to transfers that may have taken place prior to the authorized sale. Rather, the patentee only loses the right to enforce "post-sale restrictions on *purchasers*." *Id*. Their rights against the original manufacturer or designer (if it is not the patentee themselves) are unaffected.

*Keurig, Inc. v. Sturm Foods, Inc.*, cited by Adaptics, also did not expand patent exhaustion to apply directly upstream. 732 F.3d 1370 (Fed. Cir. 2013). In *Keurig*, the court held that the patentee exhausted its patent rights in its brewers after selling them without conditions to consumers. *Id*. at 1374. It therefore could not enforce its method patent rights against Sturm, which sold cartridges compatible with Keurig's brewers, because to do so would allow Keurig to control its brewers post-sale. *Id*. Here, in contrast, Perfect is not attempting to exert control over how products already sold by Apple may be used or re-sold. Instead, Perfect is exercising its right to hold Adaptics accountable for independent infringement, which necessarily occurred prior to any authorized sales by Apple for each product.

The few cases that have contemplated Adaptics' upstream patent exhaustion arguments have rejected them. *See Crossroads Sys., Inc. v. Dot Hill Sys. Corp.*, 48 F. Supp. 3d 984, 990 (W.D. Tex. 2014); *Glob. Commc'ns, Inc. v. DirecTV, Inc.*, 1 F. Supp. 3d 1305, 1308 (N.D. Fla. 2014); *Asetek Holdings, Inc. v. CoolIT Sys., Inc.*, No. C-12-4498 EMC, 2013 WL 5640905, at *2

---

questions about the scope of the patent exhaustion doctrine: First, whether a patentee that sells an item under an express restriction on the purchaser's right to reuse or resell the product may enforce that restriction through an infringement lawsuit. And second, whether a patentee exhausts its patent rights by selling its product outside the United States, where American patent laws do not apply.").

(N.D. Cal. Oct. 11, 2013). In *Asetek,* the court recognized that no other court had applied patent exhaustion to protect an upstream party and concluded that such an application would conflict with the Supreme Court's description of the doctrine in *Quanta*. 2013 WL 5640905, at *2 (citing *Quanta*, 553 U.S. at 626). The same reasoning applies here.

In addition to finding no support in case law, Adaptics' novel take on patent exhaustion is inconsistent with the main purpose of the doctrine: preventing restrictions on alienation. *See Impression Products*, 137 S. Ct. at 1532. "As Lord Coke put it in the 17th century, if an owner restricts the resale or use of an item after selling it, that restriction 'is voide, because ... it is against Trade and Traffique, and bargaining and contracting betweene man and man.'" *Id.* (quoting 1 E. Coke, Institutes of the Laws of England § 360, p. 223 (1628)). But maintaining rights against an infringing manufacturer while authorizing the re-sale of their product by a distributor does "not clog the channels of commerce" by introducing uncertainty. *Id*. at 1532. Only the manufacturer would be exposed to liability while those who purchased from the distributor would not.

Adaptics' position also cuts against the purpose of ensuring patentees recover only the fair value of their patent and would make patent litigation less efficient. *See id.* When a patentee settles with an infringing manufacturer the settlement theoretically accounts for the patent's full value, including any subsequent unforeseeable transfers. *See Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010). If a patentee wishes to retain their right to sue a particular distributor, they may include such a restriction in the license granted to the manufacturer. *See Impression Prod*., 137 S. Ct. at 1535. However, there is no corresponding method for a patentee to settle with a downstream distributor in a way that allows them to sell the product but restricts them from obtaining the product from the manufacturer. Such a restriction

would negate the license to sell the product, since the manufacturer is the product's sole source.[3] If patent exhaustion applies upstream as Adaptics suggests, there would be no way to enforce a patent against multiple infringers unless the parties settled simultaneously, a requirement that would senselessly impede efficient dispute resolution. *See also Interdigital Tech. Corp. v. OKI Am., Inc.*, 866 F. Supp. 212, 212 (E.D. Pa. 1994) (holding that settlement with one alleged infringer did not bar litigation against a second and recognizing that any other outcome would discourage settlement).

Furthermore, allowing a patentee to exhaust their rights against a distributor and its customers while maintaining them against the manufacturer does not present the threat of allowing a patentee to over-collect on their patent. When a patentee settles with a downstream distributor, both parties must necessarily be aware of the infringing manufacturer's existence and account for this by limiting the settlement to less than the patent's full value. This is all the more true when the patentee sues the manufacturer and the distributor together, a lawsuit that presupposes that each party bears a distinct portion of liability for their own infringement. A final recovery against one defendant thus may be offset by a prior settlement, but it makes no sense to say that a patent's value must be limited to the recovery for just one defendant's liability. *See Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 512 (1964).

Adaptics insists that Perfect's settlement with Apple granted the latter unrestricted authorization to sell Adaptics' products and even retroactively authorized previous sales.

---

[3] In its Supplemental Brief, Adaptics argues that recently-produced emails indicate that Perfect knowingly exhausted its rights against Adaptics by settling with Apple. Dkt. #423, at 1-2. The emails show that Perfect originally tried to limit the settlement to products "sold as Apple branded products" but that Apple rejected this as "not reasonable because it excludes the Accused Products." *Id*. at 1. However, Apple's rejection of Perfect's proposed limitation only highlights the fact that Perfect could not have settled with Apple in any meaningful way while excluding Adaptics' products from the license granted to Apple. *Id*. at 1.

Dkt. #321, at 8. Section 2.2 of the settlement agreement states that Perfect "forever discharges Apple . . . from any and all actions . . . whether known or unknown, arising out of the facts, events or occurrences underlying . . . the allegations in this lawsuit." Dkt. #322, at § 2.2. Consequently, Adaptics argues that it cannot be liable for infringement for the same exact products that Apple sold with authorization.

It is unclear whether an unconditional release retroactively authorizes past sales. Some courts have held that it can. *See Canon Inc. v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 577 (S.D.N.Y. 2015); *PSN Illinois, LLC v. Abbott Labs.*, No. 09 C 5879, 2011 WL 4442825, at *8-9 (N.D. Ill. Sept. 20, 2011). At least one other has disagreed. *Cascades*, 70 F. Supp. 3d at 870. In any case, the Court need not decide whether the settlement retroactively authorized Apple's past sales because even a prior authorized sale only exhausts the patentee's rights with respect to the seller and any downstream purchasers. It does not exhaust rights against the original manufacturer, designer, and provider of the goods. Here, that is Adaptics.

Finally, Adaptics' offhand assertion that only Apple sells its products also does not change the outcome. With respect to the Drop Scale, Adaptics' statement is simply wrong because that product can be purchased from Amazon.com and presumably elsewhere. With respect to the Drop App, Apple's privilege as the sole distributor is contingent on its monopoly control of the iOS ecosystem and marketplace. In any case, the fact that no other party directly sells the app to consumers is irrelevant. Unless Adaptics and Apple are the same company, there must necessarily have been an initial agreement between them for Adaptics' App to be available on the App Store. Because that agreement is antecedent to Apple providing the app to consumers, Adaptics is an upstream party subject to Perfect's patent rights.

# CONCLUSION

For the above reasons, Adaptics' Motion for Partial Summary Judgment [Dkt. ## 317 & 321] is DENIED.

IT IS SO ORDERED.

Dated this 19th day of March, 2019.

*Ronald B. Leighton*
Ronald B. Leighton
United States District Judge